IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGE ANTONIAK, et al.          :
                                 :
            v.                   :
                                 :          CIVIL ACTION
MARTIN ARMSTRONG,                :
                                 :
            v.                   :          NO. 18-1263
                                 :
HERITAGE NUMISMATIC AUCTIONS,    :
INC.                             :

MEMORANDUM

Bartle, J.                                    May 19, 2020

        Plaintiffs George Antoniak, Andrew Antoniak, and
I. Swit (collectively, the "Antoniaks") brought this diversity
action against defendant Martin Armstrong ("Armstrong") for a
declaratory judgment under 28 U.S.C. § 2201 that they and not
Armstrong own a collection of 58 ancient coins.  Armstrong joined
Heritage Numismatic Auctions, Inc. ("Heritage") as a third-party
defendant.  Heritage at the time had possession of the coins for
auction on behalf of the Antoniaks.  As will be explained later in
more detail, this lawsuit has now been dismissed as moot without
any declaration of ownership for either the Antoniaks or Armstrong
since it has been determined that the coins belong to a third
party.

        Before the court are the separate motions of the
Antoniaks and Heritage under Rule 54 of the Federal Rules of Civil
Procedure for:  (1) recovery of counsel fees and costs from

Armstrong under this court's inherent authority to sanction a litigant for bad faith conduct; and (2) sanctions against Armstrong's attorney Thomas Sjoblom ("Sjoblom") under 28 U.S.C. § 1927.

I

This case has a long and involved history.  It begins with Raymond Morales who was an unemployed day laborer.  He would often hang out at the Home Depot located at Whitaker Avenue and Roosevelt Boulevard in Philadelphia and obtain odd jobs.  On or about March 4, 2014, Morales and two other individuals were hired by an unknown man and driven by truck to a house in New Jersey. Morales believed its location was in Pennsauken or Cherry Hill but does not recall the address.  The unknown man paid Morales and the two other individuals $200 to clean out the house and throw away any trash.  The man also told them that they could keep anything they found.

In the course of the job, Morales came upon a large box in the basement with a smaller box full of coins.  He put the box in his backpack and took it home.  What Morales found was collection of ancient Greek and Byzantine coins, as well as an English coin of "historical significance" – a "Henry III gold penny," which as it turned out was "the single most valuable coin" in the box.  The next day, Morales went to Jewelers' Row in Philadelphia to sell the coins.  He went to a couple of different

-2-

stores that offered him $200 to $500 for the coins, but he declined.  He eventually went to I. Switt, the company owned by George Antoniak and his son Andrew Antoniak that engages in purchasing and selling diamonds, antiques, jewelry, gold, silver, precious stones, and 19th and 20th century American coins.  This was Morales's first visit to I. Switt and the first time he had ever met the Antoniaks.

Morales spoke to George Antoniak while at the store. Morales told George that he found the coins while cleaning out a house in New Jersey.  At the time, the coins were inside clear plastic holders, which contained small paper tags with information about each coin.  George testified at his deposition that he did not look at the tags.  According to George, he had never dealt with rare and ancient coins of this type before this particular transaction.  George took the coins out of the box, looked at them, and thought some of the coins might be fake and some might be valuable.  He weighed the coins and arrived at a value of $6,000 based on the price of gold that day.  He testified that this was the standard method that he used to buy gold and silver.  George offered $6,000 to Morales for the 58 coins, and Morales accepted without any negotiation.  George drafted a handwritten receipt memorializing the transaction, which included Morales's address and Pennsylvania driver's license number.  Morales signed the receipt.

George did not receive or request any document or other information from Morales about the ownership of the coins.

After the purchase, Andrew examined the tags and researched the coins on the internet.  Andrew realized that the coins were indeed valuable based on a review of several auction house catalogs on the internet but did not call or speak to any of the auction houses.  Nor did he speak to any rare coin dealers or find information regarding Armstrong during his internet research. The Antoniaks kept the coins in a bank safe deposit box for three years after the purchase.

On September 14, 2017, the Antoniaks entered into a Consignment Agreement with Heritage to auction the coins at issue. The Consignment Agreement contains a warranty that states in part:

> "You warrant that you are the sole owner of
> the Properties, that you have not encumbered
> the Properties in anyway . . . that you have
> the absolute right to consign the Properties
> to auction, good title will pass to the
> purchaser, and that all of the Properties are
> genuine."

The Antoniaks agreed to indemnify Heritage for "[a]ll claims, disputes, or controversies in connection with, relating to, and/or arising out of this Agreement."  All disputes were to be subject to arbitration.

Heritage scheduled an auction for the coins for January 2018 and started advertising them in catalogs in the fall of 2017.

Heritage valued and insured the coins for $2.5 million – coins for
which the Antoniaks paid Morales only $6,000.

In December 2017, having learned of the scheduled
auction, Thomas Sjoblom, the attorney for Armstrong, contacted
Heritage and asserted that Armstrong was the true owner of the coin
collection consigned to Heritage by the Antoniaks and demanded its
return.  Armstrong also sent an email to industry competitors of
Heritage in which he claimed that he could "prove beyond a shadow
of doubt that [he] was the purchaser of those coins."  He also
stated that Heritage needed to "demonstrate [it] did not simply buy
stolen material on the cheap or [is] facilitating someone else in
their crime making this a criminal conspiracy."  Thereafter,
Heritage removed the coins from the auction and agreed to retain
them until the dispute regarding ownership was resolved.

On March 27, 2018, the Antoniaks, using "John Doe"
pseudonyms, filed a complaint in this court against Armstrong.  The
complaint sought a declaration of ownership of the 58 coins.
Thereafter, Armstrong filed a third-party complaint against
Heritage.  In the third-party complaint against Heritage, Armstrong
asserted that he is the rightful owner of the 58 coins and that the
coins should be returned to him immediately.  Heritage subsequently

filed a motion to dismiss the third-party complaint against it, which this court denied on October 25, 2018.[1]

On August 6, 2018, this court granted as unopposed the motion of Armstrong to strike the Antoniaks' use of pseudonyms and to compel use of legal names.  As a result, the Antoniaks filed an amended complaint using their own names.  Armstrong filed an answer to the amended complaint with counterclaims against the Antoniaks for declaratory judgment, conversion, unjust enrichment, and for injunctive relief.

On November 8, 2018, Heritage filed an answer to Armstrong's third-party complaint.  In the answer, Heritage asserted cross-claims against the Antoniaks for indemnification under the terms of the Consignment Agreement entered into by the Antoniaks and Heritage and under common law.  Heritage sought a judgment against the Antoniaks "in the amount equal to its legal fees, costs and liability exposure to Armstrong."  On December 13, 2018, in response to the cross-claims of Heritage, the Antoniaks filed a motion to compel arbitration pursuant to their Consignment Agreement and to stay any indemnification due under the cross-claims.  This court granted the motion to stay the arbitration proceeding pending resolution of the ownership

---

[1]   Armstrong opposed the motion.  The court at that early stage had to take Armstrong's factual allegations against Heritage as true.

dispute presented before this court.  Heritage, we reiterate, agreed to withdraw the coins from auction and to hold them pending resolution of the litigation.

In May 2019, the Antoniaks and Armstrong filed motions for summary judgment in which they sought a declaration of ownership of the 58 coins.  Heritage also sought summary judgment.

In the meantime, there had been related legal activity involving Armstrong in the United States District Court for the Southern District of New York.  On September 13, 1999, over eighteen years before this case was filed, Armstrong had been arrested on a complaint charging him with securities fraud.  The complaint alleged that Armstrong had persuaded Japanese investors to entrust approximately $3 billion with various companies he controlled, including Princeton Economics International, Ltd. ("PEIL"), which had been owned by Armstrong or of which he was a corporate officer.

On the same day that Armstrong was arrested, the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") instituted civil proceedings against Armstrong and PEIL.  Pursuant to the district court's orders, a court-appointed receiver for PEIL demanded that Armstrong return misappropriated corporate records and assets, including approximately $16 million worth of rare coins, gold

bullion bars, and various antiquities.  Armstrong refused to produce the misappropriated items or answer any questions concerning their whereabouts.  He asserted that forcing him to turn over corporate records and assets would violate his Fifth Amendment right against compelled self-incrimination.

Judge Richard Owen held two civil contempt hearings in January 2000, during which he directed Armstrong to turn over all of the corporate assets, records, and documents in his possession.  Subsequently, on January 14, 2000, Judge Owen held Armstrong in contempt for failing to abide by the court's turnover order.  The court ordered that Armstrong be confined at the New York Metropolitan Correctional Center until he either complied with the turnover order or demonstrated that it would be impossible for him to do so.  Following his confinement, the district court conducted periodic hearings in an effort to induce compliance and to ensure that Armstrong's detention remained coercive rather than punitive.  On October 8, 2004, at the conclusion of such a hearing to induce compliance with the turnover order, Judge Owen issued an opinion stating that Armstrong's position was not that he "could not comply; it was just that [he] would not comply."  SEC v. Princeton Econ. Int'l, Ltd., 338 F.Supp.2d 465, 466 (S.D.N.Y. 2004).  Armstrong continued to serve over seven years in prison for contempt.

Meanwhile, Armstrong filed numerous interlocutory appeals from the district court's repeated determinations that his detention remained coercive.  The Court of Appeals for the Second Circuit denied all of these appeals on jurisdictional grounds, but on February 26, 2004 the Court invited Armstrong to submit a habeas petition as a means of having his constitutional and statutory claims addressed on the merits.  The Court stated, "[w]e base[d][our] decision, in part, on [the] belief that a ruling squarely addressing the merits of Armstrong's arguments [would] streamline the ultimate resolution of this case." S.E.C. v. Armstrong, 88 F. App'x 460, 462 (2d Cir. 2004).  On December 23, 2004, the district court denied Armstrong's habeas petition.

On August 17, 2006, while in prison for contempt, Armstrong also pleaded guilty to one count of conspiracy to commit securities fraud, wire fraud and commodities fraud in front of Judge John Keenan.  See U.S. v. Armstrong, No. 99-CR-0997 (S.D.N.Y.) (08/17/06 Hearing Transcript at 9, ¶¶ 18-21). Thereafter, on April 10, 2007, Judge Keenan sentenced Armstrong to five years of imprisonment to be served "separate from the civil contempt proceeding."  Judge Keenan found that "[t]here is no viable authority that allows this Court to credit Armstrong's criminal sentence for the time he has served on the civil

contempt proceeding before Judge Owen, now Judge Castel."   See Id. (Dkt. No. 160).

On November 27, 2006, the Court of Appeals for the Second Circuit rejected Armstrong's habeas appeal.   See Armstrong v. Guccione, 470 F.3d 89 (2d Cir. 2006).   In this decision, the Court summarized Judge Owen's detailed findings of fact and conclusions from the civil contempt hearings, but determined that "the district court may not indefinitely rely on its prior finding" that "Armstrong is capable of complying but chooses not to do so."   Id. at 113.   The Court found that, "[a]fter the passage of a significant period of time, a contemnor who is coercively confined and claims, like Armstrong, to be incapable of complying with the court's order, is entitled to have the court convene a new hearing."   Id.

While affirming Judge Owen in all respects, the Court ordered a new hearing into "whether Armstrong is in possession of the property (or the proceeds thereof) which is the subject of the court's production order, so that he is able to comply with it."   Id.   The court noted that, "while we emphasize that we have never found any fault in Judge Owen's skillful handling of this case, we believe that on the seventh anniversary of Armstrong's confinement, his case deserves a fresh look by a different pair of eyes."   Id.

-10-

Judge Kevin Castel was assigned to the case on remand. Judge Castel reviewed Armstrong's litigation history and concluded that Armstrong's continued incarceration on the civil contempt order had no realistic possibility of producing compliance with the turnover orders.  The court then lifted the civil contempt sanction and thereafter ordered Armstrong to begin serving his five-year sentence for securities fraud.

On June 24, 2008, while incarcerated for his fraud conviction, Armstrong entered into a "Judgment and Consent Order of Permanent Injunction and Other Equitable Relief Against Defendant Martin A. Armstrong" ("consent order") with the CTFC. Armstrong's attorney, Thomas Sjoblom, also signed and consented to the consent order.  CFTC v. Princeton Glob. Mgmt. Ltd., 2008 WL 6926640, *5 (S.D.N.Y. June 24, 2008).  In the consent order, Armstrong acknowledged that he was "waiv[ing] all of his rights and claims to the property and assets listed in Exhibit 1."[2]  The consent order further acknowledged that Armstrong was transferring to the court-appointed receiver all ownership interest in any of the coins identified in a Declaration of Stamatios Stamoulis ("Stamoulis Declaration").  Stamoulis was a former associate at the law firm of O'Melveny & Myers, LLP, who

---

[2]    Exhibit 1 identified "with particularity" a "declaration of Stamatios Stamoulis, dated December 15, 1999."

-11-

was hired by the court-appointed receiver for PEIL to conduct an investigation into Armstrong's assets. The Stamoulis Declaration included an inventory of at least 49 of the 58 coins at issue. Stamoulis had identified them during his investigation as belonging to the receivership estate, although thereafter Armstrong claimed that he "did not have – nor likely saw – the 1999 Stamoulis declaration" before signing the CFTC consent order.

Following Armstrong's agreement with the CFTC, Armstrong filed no claim or objection to the plan of final distribution to the receivership of his assets, including the coins at issue. The consent order included a provision that any person that failed to file a claim was "forever barred, estopped, and permanently enjoined from asserting a claim, whether directly or indirectly, against any of the . . . Receivership Property." SEC v. Armstrong, 2019 WL 1777097, at *1 and n.2 (2d Cir. Apr. 23, 2019).[3] On October 6, 2017, Judge Castel authorized the closure of the matter, approved the final plan of distribution submitted by the court-appointed receiver,

---

[3]   Receivership Property was defined to "refer to anything of value held by the corporate entities that are the subject of the Receivership including, without limitation, the assets described in the Receiver Report . . . ." SEC and CFTC v. Armstrong, et al., 2d Cir. Case No. 17-3572, (Dkt. No. 135).

and granted other ancillary relief. SEC v. Armstrong, No. 17-3572, 2019 WL 1777097, at *1 (2d Cir. Apr. 23, 2019).

On May 13, 2019, while the parties' motions for summary judgment were pending in this court, the court-appointed receiver for PEIL sought to intervene here after, as he explained, he discovered the existence of this action by happenstance. The receiver also filed an Application for an Order to Show Cause in the United States District Court for the Southern District of New York, in which the receiver asserted that the 58 coins at issue are in fact the property of the receivership estate, not any party, including Armstrong, vying for ownership in the matter before this court. See S.E.C. v. Princeton Econ. Int'l, Ltd., et al., No. 99-cv-09667 (S.D.N.Y. May 13, 2019) (Dkt. No. 500). The Application also sought transfer of the coins from Heritage to the Receiver.

In light of the receiver's Application in the Southern District of New York, this court held a hearing and status conference on May 31, 2019 in which counsel for the receivership participated. Following the hearing and after considering the positions of all parties as well as the receiver, this court stayed the proceedings in this action pending Judge Castel's resolution of the receiver's Application in that court.

Judge Castel held two hearings on June 13, 2019, and on July 31, 2019 to determine whether the 58 coins consigned to

Heritage belonged to the receivership estate.  See S.E.C. v. Princeton Econ. Int'l, Ltd., et al., No. 99-cv-09667 (S.D.N.Y.); C.F.T.C. v. Princeton Global Mgmt., Ltd., et al., No. 99-cv-09669 (S.D.N.Y.).  The Antoniaks, Armstrong, and Heritage were given notice and participated in those hearings.  After the first hearing on June 13, 2109, Judge Castel found that 49 of the 58 coins at issue in this matter "are among the rare coins that are the subject of this Court's September 13, 1999 Order, January 7, 2000 Order, August 25, 2000 Order, and the CFTC Consent Order[.]"  See S.E.C. v. Princeton Econ. Int'l, Ltd., et al., Order, 7/16/2019, No. 99-cv-9667, (S.D.N.Y.) (Dkt. No. 533).

During that first hearing in the Southern District of New York, the Antoniaks conceded that all 58 of the coins in question belonged to the receivership estate.  The Antoniaks advised Judge Castel that they supported the receiver's position that the coins should be turned over to the receiver, because "it was not obvious for a long time, but it became quite obvious as it went on that there was no way these coins were anything but, you know, subject to the receivership."  See S.E.C. v. Princeton Econ. Int'l, Ltd., et al., No. 99-cv-9667, (S.D.N.Y.) (June 13, 2019 Hearing Transcript), at 81, ¶¶ 2-5.

Armstrong also conceded at this hearing that 49 of the 58 coins in question belonged to the receiver.  Armstrong's

attorney, Thomas Sjoblom, stated, "I think one thing, for clarity purposes, Mr. Armstrong does not dispute--in fact, concedes that the 49 coins were corporate property and they're subject to the CFTC judgment." Id. at 41, ¶¶ 10-12.

During the second hearing on July 21, 2019, Judge Castel determined that the remaining nine coins were also part of the receivership estate. See Id. Order, 9/5/2019, 99-cv-9667 (S.D.N.Y.) (Dkt. No. 570). While Armstrong had maintained that he could "prove beyond a shadow of doubt" that he was the owner of the 58 coins, Judge Castel found that Armstrong "failed to offer any credible documentation or explanation identifying a right to or interest in the fifty-eight coins held by Heritage . . ." Id. at ¶¶ 84-86, 88. Indeed, Armstrong declined an invitation from Judge Castel to testify under oath concerning ownership. Id. at ¶¶ 81-83

On October 18, 2019, this court vacated the stay and dismissed this action as moot in light of the orders issued by Judge Castel, in which he ruled that all the coins in issue belong to the estate of PEIL and that Armstrong did not own any of them. See Antoniaks v. Armstrong, et al., Order, 10/18/2019, No. 18-CV-1263 (E.D. Pa.) (Dkt. No. 119).

Thus, by the end of the day, the Antoniaks had conceded they did not have any ownership interest in the 58 coins. Armstrong likewise had conceded he did not have any

-15-

ownership in 49 of the coins and never offered any credible evidence that he owned any of the remaining coins.

III

As noted above, the Antoniaks and Heritage seek counsel fees from Armstrong under Rule 54 of the Federal Rules of Civil Procedure.[4]  This is a common law diversity action where no fee shifting statute is involved.  In such a case, the so-called American Rule applies, where each party, regardless of success, with certain exceptions not relevant here, bears its own attorney's fees and costs.  Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247 (1975).

Nevertheless, Federal courts have inherent power to sanction a party when it has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," or where "fraud has been practiced upon it, or that the very temple of justice has been defiled."  Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991).  As stated more recently in Goodyear Tire & Rubber Co. v. Haeger:

> "Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of

---

[4]    Rule 54 sets forth certain procedures for awarding attorneys' fees and costs.  Section (d)(1) specifies that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party."  Section (d)(2) states that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."

> cases . . . includ[ing] the ability to
> fashion an appropriate sanction for conduct
> which abuses the judicial process."

137 S. Ct. 1178, 1186 (2017) (citations and quotations omitted).

Under this inherent power, a court may order the offending party to pay the attorney's fees and costs of the innocent or prevailing party in order to make the latter party whole for expenses caused by the misconduct of the offending party.  Id. at 1182; Chambers, supra at 46.  Such a sanction must be compensatory, rather than punitive.  An award may not be "punishment" for a "party's misbehavior."  Id. at 1186.  A sanction counts as compensatory only if it is "calibrate[d] to [the] damages caused by" the bad-faith acts on which it is based.  See Mine Workers v. Bagwell, 512 U.S. 821, 834 (1994).  Thus, court may award only those fees that the innocent or prevailing party would not have incurred in the absence of litigation misconduct.  Goodyear Tire, supra at 1182; Chambers, supra at 46.  The district court has broad discretion to calculate an award and in doing so it does not have "to achieve auditing perfection."  Id. at 1187.

As noted above, the Antoniaks and Heritage also seek sanctions against Armstrong's attorney Thomas Sjoblom ("Sjoblom") under 28 U.S.C. § 1927.  Section 1927 provides, in relevant part:

> [a]ny attorney or other person admitted to
> conduct cases in any court of the United
> States or any Territory thereof who so

> multiplies the proceedings in any case
> unreasonably and vexatiously may be required
> by the court to satisfy personally the
> excess costs, expenses, and attorneys' fees
> reasonably incurred because of such conduct.

Under § 1927, a district court may assess an award of fees against an attorney appearing before the court only if: (1) the actions of the attorney multiply the proceedings, and (2) the attorney's actions are vexatious and unreasonable. Zuk v. Eastern Pennsylvania Psychiatric Inst., 103 F.3d 294, 297 (3d Cir.1996). The court should exercise restraint in imposing sanctions under this provision, because "[t]he power to sanction under § 1927 necessarily carries with it the potential for abuse, and therefore the statute should be construed narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC., 287 F.3d 279, 289 (3d Cir. 2002). Before sanctions may be imposed under § 1927, a court "must make a finding of willful bad faith on the part of the offending attorney . . ." In re: Orthopedic Bone Screw Prod. Liab. Litig., 1998 WL 633680, at *3 (E.D. Pa. Aug. 14, 1998), aff'd sub nom., 193 F.3d 781 (3d Cir. 1999).

IV

We turn first to the motion of the Antoniaks for an award of their counsel fees and costs against Armstrong in the

amount of 441,913.86.[5]  The Antoniaks initiated this action against Armstrong in which they sought a declaration that they owned the 58 rare coins in question.  They acquired the coins from Raymond Morales, an unemployed laborer, who told them he found the coins while cleaning out the basement of a house in New Jersey.  He did not know the name of the person who paid him to do the job and did not know the address of the house. Despite this highly unusual story, the Antoniaks did not investigate the provenance of the coins and then kept the coins hidden away in a safe deposit box for three years before consigning them for auction.  The Antoniaks, who are coin dealers, paid an unsophisticated seller only $6,000 for the coins which they surely had reason to know were of significant value and which the evidence shows were worth $2.5 million.  It is also surprising that the Antoniaks, who are in the business of selling coins, would keep such a valuable collection off the market for so long if they were confident that they were bona fide purchasers.  In addition, it is odd that after Armstrong claimed ownership, the Antoniaks initially hid their identity by bringing suit in this court in the name of "John Does."

---

[5]    The Antoniaks seek $42,411.36 as litigation expenses paid out of pocket and $399,502.50 as fees and costs for their former and present counsel.

As this litigation continued along with the
proceedings in the Southern District of New York, the Antoniaks
conceded that the coins did not belong to them but to the
receivership estate of PEIL.  While the lawsuit in this district
was precipitated by Armstrong's false claim of ownership, he too
ultimately conceded that at least all but nine of the coins were
owned by the estate of PEIL.  Judge Castel in the Southern
District of New York found that all of the coins belonged to the
estate of PEIL and that Armstrong had produced no credible
evidence to the contrary.

The Antoniaks bought the rare coins under suspicious
circumstances at an unfair price, hid the coins, and did little,
if anything, to establish their provenance before or after
instituting their anonymous lawsuit.  In the end, they agreed
the coins did not belong to them.  Likewise, Armstrong, a felon
convicted of fraud, made claims of ownership that he knew or
should have known were false.

To state the obvious, neither the Antoniaks nor
Armstrong had a right to the coins.  They were adversaries
fighting in court over coins that belonged to a third party.  In
seeking their counsel fees and costs, the Antoniaks cannot show
they are either innocent or prevailing parties.  See Goodyear,
supra at 1184; Chambers, supra at 46.  However the conduct of
Armstrong should be characterized, the proper remedy is not to

-20-

order Armstrong or his attorney to compensate the Antoniaks for their counsel fees and costs.  An award to the Antoniaks would not vindicate judicial authority.  In sum, there is no basis for not applying the American Rule.  The Antoniaks' motion for counsel fees and costs against Armstrong is without merit and will be denied.

V

Heritage also seeks an award of attorneys' fees and costs against Armstrong in the amount of $291,439.30.  Heritage claims that Armstrong's third-party complaint against it lacked foundation and "was based upon statements that were knowingly false."  According to Heritage, "[e]very action by Armstrong and his attorney was undertaken in bad faith for an ulterior motive" and that "[Armstrong] and his attorney filed the action for the purpose of harassing Heritage and forcing it to incur substantial legal expenses in a failed attempt to force Heritage to settle with Armstrong."

Armstrong alleges in his third-party complaint that he "possess[ed] documentation of his purchase of the [58] coins." See No. 18-CV-1263 (E.D. Pa. June 14, 2018) (Dkt. No. 8, ¶ 14). He claims that the third-party complaint against Heritage was justified because:  (1) he had a good faith belief that the 58 coins were his personal property; and (2) it was unclear which coins were subject to the CFTC consent order.  None of that is

true.  Furthermore, Armstrong states that he "filed his third-party suit because Heritage refused to tell him what coins they had, how they obtained them, who the consignor was, and to allow an inspection."  Armstrong's bad faith was exhibited in his emails to third parties that Heritage "knew the coins were stolen property but chose to pursue a lawsuit nonetheless."

The long history of litigation both in this district and the Southern District of New York has revealed that no credible evidence of Armstrong's ownership exists.  Judge Castel ruled that Armstrong "failed to offer any credible documentation or explanation identifying a right to or interest in the fifty-eight coins held by Heritage."  See Order 09/05/2019, No. 99-cv-9667, (S.D.N.Y.) (Dkt. No. 570, ¶ 86).  Moreover, at the time of the filing of the third-party complaint, Armstrong and his attorney Thomas Sjoblom were aware of and signatories to a CFTC consent order which transferred ownership of at least 49 of the 58 coins at issue to the receivership estate.  Furthermore, "Armstrong offered nothing to show that he purchased any of the nine [remaining] coins with this personal funds."  Id. at ¶ 81.

Armstrong does not dispute that in December of 2017, before this case had been filed, Heritage readily agreed not to sell the coins in question and withdrew them from auction pending resolution of the ownership dispute.  Armstrong nevertheless joined Heritage as a third-party defendant, opposed

-22-

Heritage's withdrawal from the case, and subjected it to
continued and unnecessary expense for no other purpose than to
harass and coerce a settlement.  The lawsuit ended with Heritage
as an innocent and prevailing party.

Armstrong acted vexatiously and in bad faith toward
Heritage throughout the history of this lawsuit.  Armstrong's
third-party complaint against Heritage was an abuse of judicial
process as was his entire course of conduct against Heritage
from the start.  See Chambers v. NASCO, Inc., 501 U.S. 32, 44
(1991).  Armstrong, a sophisticated party quite familiar with
the legal process, knew or should have known from the beginning
that he had no ownership interest in the 58 coins.  Indeed he
never produced one scintilla of credible evidence of his
ownership.  He falsely and maliciously accused Heritage of
knowingly dealing in stolen property.  Furthermore, Heritage
agreed to withhold the coins from auction and to hold them
pending resolution of this action.  Our Court of Appeals has
determined that, "what would be indicative of bad faith in a
case such as this one, would be some indication of an
intentional advancement of a baseless contention that is made
for an ulterior purpose, e.g., harassment or delay."  Ford v.
Temple Hosp., 790 F.2d 342, 347 (3d Cir. 1986).

While the court must exercise with caution its
inherent authority to impose counsel fees and costs, this is

-23-

that exceptional case where imposition of counsel fees and costs
is warranted in favor of Heritage, an innocent and prevailing
party, and against Armstrong.

We also award Heritage its counsel fees and costs
jointly and severally against Thomas Sjoblom, Armstrong's
attorney, pursuant to 28 U.S.C. § 1927.  We find that Sjoblom's
conduct constituted "willful bad faith."  See In re: Orthopedic,
supra at *3.

It was Sjoblom who signed and filed the third-party
complaint.  See No. 18-CV-1263 (E.D. Pa. June 14, 2018)
(Dkt. No. 8).  In the third-party complaint signed by Sjoblom,
Armstrong claimed ownership of the coins without any factual basis.
Sjoblom, along with Armstrong, had also signed and consented to the
CFTC consent order that specifically stated that Armstrong waived
all of his rights and claims to the property and assets listed
in the Stamoulis Declaration.  Sjoblom further filed the third-
party complaint when he knew that Heritage had agreed to retain the
coins pending resolution of the ownership issue.  Sjoblom was
Armstrong's long-time attorney who knew or should have known that
Armstrong did not own any of the coins in issue.

Heritage is entitled to all its reasonable counsel fees
and costs caused from the start by the above described misconduct
of Armstrong and Sjoblom.  Heritage, however, has not yet provided
this court with affidavits disclosing its time records, hourly

-24-

rates, and costs in support of its motion.  Heritage may do so within 14 days.  Armstrong and Sjoblom will have 14 days to file any objections to the <u>amount</u> sought by Heritage.  Within seven days thereafter, Heritage may file a reply.